**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

---

**No. 22-4508**

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

AGHEE WILLIAM SMITH, II,

Defendant – Appellant.

---

**No. 22-4521**

---

UNITED STATES OF AMERICA,

Plaintiff – Appellee,

v.

DAVID ALCORN,

Defendant – Appellant.

---

Appeals from the United States District Court for the Eastern District of Virginia, at Norfolk.  Raymond A. Jackson, Senior District Judge.  (2:19-cr-00047-RAJ-LRL-3; 2:19-cr-00047-RAJ-LRL-2)

---

ARGUED:  May 10, 2024                    Decided:  September 17, 2024
                    Amended:  September 18, 2024

---

Before KING, AGEE, and HEYTENS, Circuit Judges.

---

Appeal No. 22-4508 affirmed, and Appeal No. 22-4521 affirmed in part, vacated in part, and remanded, by published opinion. Judge King wrote the majority opinion. Judge Agee wrote an opinion concurring in part and concurring in the judgment. Judge Heytens wrote a dissenting opinion.

---

**ARGUED:** Michael E. Rayfield, SHOOK, HARDY & BACON L.L.P., New York, New York, for Appellants. Elizabeth Marie Yusi, OFFICE OF THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appellee. **ON BRIEF:** Andrew W. Grindrod, Assistant Federal Public Defender, OFFICE OF THE FEDERAL PUBLIC DEFENDER, Norfolk, Virginia; Luke L. Hartman, SHOOK, HARDY & BACON L.L.P., Kansas City, Missouri, for Appellant Aghee William Smith II. Paul Graham Beers, GLENN, FELDMANN, DARBY & GOODLATTE, Roanoke, Virginia, for Appellant David Alcorn. Jessica D. Aber, United States Attorney, Richmond, Virginia, Daniel J. Honold, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

---

KING, Circuit Judge:

We herein resolve the consolidated appeals of defendants Aghee William Smith, II (No. 22-4508) and David Alcorn (No. 22-4521). Smith and Alcorn appeal from their convictions and sentences in the Eastern District of Virginia for their involvement in long-running illegal schemes that defrauded multiple investors of millions of dollars. In February 2022, during the COVID-19 pandemic, they were tried together before a jury in Norfolk. On appeal, Smith and Alcorn pursue a total of three contentions of error that relate to their trial and sentencing proceedings. They first assert a joint constitutional challenge to their various convictions — that is, that the district court's implementation of the district-wide COVID-19 trial protocol denied them their rights under the Public Trial Clause of the Sixth Amendment. Second, defendant Smith separately contends that the court fatally erred by its admission into evidence of court-authorized videotaped depositions of three of the fraud victims, in violation of the Sixth Amendment's Confrontation Clause.[1] Finally, defendant Alcorn separately maintains that the court committed a reversible sentencing error, by failing to properly impose his conditions of supervised release.

---

[1] The Sixth Amendment provisions that underlie the public trial and witness confrontation issues — which we refer to as the "Public Trial Clause" and the "Confrontation Clause" — provide in pertinent part as follows:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial [the "Public Trial Clause"] . . . and . . . to be confronted with the witnesses against him [the "Confrontation Clause"] . . . .

See U.S. Const. amend. VI.

As explained herein, we reject Smith and Alcorn's joint contention under the Public Trial Clause and Smith's separate contention under the Confrontation Clause. We therefore affirm Smith's multiple convictions and sentences, and we also affirm each of Alcorn's convictions. Because the district court erred in connection with Alcorn's sentencing, however, we vacate his sentences and remand.

I.

A.

On March 21, 2019, the federal grand jury in Norfolk indicted defendants Smith, Alcorn, and four other defendants in a single 17-count indictment returned in connection with long-running mail and wire fraud schemes involving multiple conspirators. *See United States v. Maerki*, No. 2:19-cr-00047 (E.D. Va. Mar. 21, 2019), ECF No. 2 (the "Indictment"). One of the alleged fraud schemes entailed the marketing and selling of phony investments in an entity called Dental Support Plus Franchise, LLC ("DSPF"), which Smith and Alcorn, among others, falsely claimed was a franchisor of a dental services marketing program that would refer patients to dentists in return for a portion of the fees earned from those patients. With respect to DSPF, the Indictment alleged that from early 2011 until August 2014, Smith and Alcorn "pitched DSPF to investors across the country using advertisements that were materially false and misleading." *Id.* at 4, 19. The alleged losses from the DSPF fraud scheme totaled more than $9 million.

Another fraud scheme underlying the Indictment involved the marketing and selling of fraudulent spectrum investments. In relevant part, the Indictment alleged that, between

2012 and 2015, Smith, Alcorn, and other schemers and conspirators "sold, and caused to be sold, fraudulent spectrum investments to investors and then continued to lull investors regarding the purported value of such investments." *See* Indictment 14.[2]

For his alleged involvement in the mail and wire fraud schemes, Alcorn was indicted on 13 offenses:

- A single count of conspiracy to commit mail and wire fraud (Count Two), in contravention of 18 U.S.C. §§ 1341, 1343, and 1349;

- Eleven counts of wire fraud (Counts Seven through Seventeen), in violation of 18 U.S.C. §§ 1343 and 2; and

- A single count of engaging in unlawful monetary transactions (Count Nineteen), in contravention of 18 U.S.C. § 1957.

For his part, Smith was indicted as a codefendant of Alcorn in five counts of the Indictment, that is, Counts Two, Eight, Nine, Sixteen, and Seventeen. Separately, Smith was charged, along with several codefendants, with a single count of conspiracy to commit mail and wire fraud (Count One), in violation of 18 U.S.C. §§ 1341, 1343, and 1349.

B.

After the Indictment was returned in 2019, the district court conducted extensive pretrial proceedings involving defendants Smith and Alcorn, and their codefendants and

---

[2] The term "spectrum," as used herein, refers to a part of the electromagnetic spectrum (e.g., radio wavelengths) that is licensed by the Federal Communications Commission (the "FCC") for a particular purpose, such as operating a mobile telephone network or a radio station. A license holder is entitled to lease its spectrum allotment to another individual or entity. As part of the spectrum fraud scheme, Smith and Alcorn allegedly offered and marketed false and fraudulent FCC license application services to investors.

coconspirators, concerning the Indictment and several related prosecutions.  For example, the separate case of two coconspirators was consolidated with this one, rendering it a prosecution of eight defendants.  In September 2020 — in the midst of the COVID-19 pandemic — the court severed those eight defendants into three groups.  The court's severance decisions resulted in Smith and Alcorn being joined with another defendant, who pleaded guilty before trial.  The 14-day jury trial of Smith and Alcorn was conducted in Norfolk in February 2022.

1.

a.

Of relevance here, the conditions of the COVID-19 pandemic seriously deteriorated in about November 2020.  In response, Chief Judge Davis of the Eastern District of Virginia issued a series of administrative orders that suspended all criminal trials in the district until at least March 1, 2021.  Shortly thereafter, the Chief Judge issued a district-wide order containing the court's protocol for jury trials conducted during the pandemic.  *See* E.D. Va. Gen. Order No. 2021-04 (Mar. 18, 2021) (the "COVID-19 Protocol").  As relevant here, the COVID-19 Protocol specified that

> in order to safely conduct a mid-pandemic jury trial (civil or criminal), the Court must utilize a specially retrofitted courtroom, often repurposing the entire gallery as a socially distanced jury box.  Such procedure generally requires the use of two *additional* courtrooms, one to act as a jury room, and one to allow members of the public to watch a live video-feed of the trial courtroom.

*Id.* at 4.

Pursuant to the district court's COVID-19 Protocol, the trial of defendants Smith and Alcorn would utilize three courtrooms.  First, the bulk of the trial proceedings would be conducted in a "trial courtroom" to be used by the jury, court personnel, defendants, and lawyers.  The trial courtroom would allow for appropriate social distancing to prevent or limit the spread of COVID-19.  More specifically, it would allow the jurors to be socially distanced from each other — in an area of the trial courtroom called the "gallery" — instead of sitting in the jury box.  Because social distancing would require the jury to take up the majority, if not the entirety, of the gallery, a second courtroom would be designated as the "public-viewing courtroom" in which the public could observe trials through video and audio streams.[3]  And a third courtroom would be reserved as a jury room since standard jury rooms did not allow for social distancing.

b.

On October 27, 2021, defendant Smith filed with the district court a "Motion for Courtroom Procedures that Conform with the Constitution," asserting that implementation of the COVID-19 Protocol was unconstitutional under the Sixth Amendment's Public Trial Clause.  Smith's motion was promptly joined by defendant Alcorn.  They challenged the anticipated closing of the trial courtroom and the use of a video feed that would not permit those in the public viewing courtroom to observe the jury.  In challenging the video feed

---

[3] In applying the COVID-19 Protocol, the district court installed multiple cameras in the trial courtroom to capture audio and video from several angles, seeking to acquire sounds and views from the lectern used by the lawyers, from the witness box, from the exhibits, and otherwise from the judge and the balance of the courtroom.  The live audio and video feed were then streamed to the public viewing courtroom.

7

of the trial proceedings, Smith and Alcorn argued that the court had erroneously "used a similar procedure" in conducting an earlier trial of two of Smith and Alcorn's coconspirators, named Bank and Seabolt. *See* J.A. 265.[4] And they argued that, during "the Bank trial, the video feed did not allow the public to observe the jurors." *Id.* Smith and Alcorn maintained that the procedures under the COVID-19 Protocol with respect to the public viewing courtroom — specifically, the inability of the public to view the jurors — would violate their rights under the Public Trial Clause.

In support of their Public Trial Clause contention, Smith and Alcorn relied primarily on the Supreme Court's 1984 decision in *Waller v. Georgia*, 467 U.S. 39 (1984). The *Waller* decision identified circumstances where a courtroom closure can be constitutionally permissible:

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure.

*Id.* at 48. Arguing that the anticipated video and audio feeds authorized by the COVID-19 Protocol would not permit the public to observe the jury during their trial, Smith and Alcorn contended that "the proposed closure [was] broader than necessary to protect the interest in maintaining safety during the pandemic and there [was] a reasonable alternative to the breadth of the anticipated closure." *See* J.A. 265.

_____

[4] Citations herein to "J.A. ___" refer to the contents of the Joint Appendix filed by the parties in these appeals.

c.

Three months later, on January 28, 2022, the district court filed a memorandum

order denying Smith and Alcorn's motion concerning the COVID-19 Protocol. *See United

States v. Maerki*, No. 2:19-cr-00047 (E.D. Va. Jan. 28, 2022), ECF No. 370 (the "Protocol

Ruling").   The Protocol Ruling addressed, inter alia, whether the court's proposed

implementation of the COVID-19 Protocol would contravene Smith's and Alcorn's rights

under the Public Trial Clause.  Although Smith and Alcorn argued that the video feed to

be streamed to the public viewing courtroom — which would not show the jury — violated

their constitutional right to a public trial, the Protocol Ruling rejected that contention.  In

so ruling, the court first concluded that its compliance with the COVID-19 Protocol would

be neither a partial nor a complete courtroom closure.  And the Protocol Ruling emphasized

that Smith and Alcorn had

> fail[ed] to cite to any authority indicating that the current procedures strictly
> constitute a "closure" as it is understood under the Sixth Amendment.
> Instead, their argument relie[d] on the premise that the current set up is a
> "closure," rather than a "reasonable alternative" to closing the proceedings.

*Id.* at 7 (footnote omitted).  Additionally, the court explained that Smith and Alcorn had

"failed to establish as a factual matter that there [would] be any complete closure of the

proceedings triggering analysis of the *Waller* factors."   *Id.* (internal quotation marks

omitted).

The Protocol Ruling also reasoned that, if the district court's implementation of the

COVID-19 Protocol constituted some type of courtroom closure, it nevertheless satisfied

the *Waller* mandate.  With respect to the first *Waller* prong, the court ruled that public

health concerns arising from COVID-19 satisfied both the "overriding interest" standard that would apply to a total courtroom closure and the alternative "substantial reason" standard that would apply to a partial courtroom closure. *See* Protocol Ruling 8 (internal quotation marks omitted). And the "presumption of openness" of courtrooms, the court emphasized, was "overcome by an overriding interest in stemming the spread of COVID-19 and protecting the public health." *Id.* (internal quotation marks omitted).

Turning to the second *Waller* prong — i.e., that the closure of a courtroom can be no broader than necessary to protect the asserted interest — the Protocol Ruling concluded that the district court's COVID-19 Protocol was exactly that. That is, it was, as the court specified, "no broader than necessary to protect" the overriding interest of stopping the spread of COVID-19. *See* Protocol Ruling 9 (internal quotation marks omitted). And the court emphasized the "extraordinary lengths" that courthouse personnel were undertaking to "preserve a defendant's constitutional rights amidst a highly contagious, potentially lethal, and perpetually fluctuating pandemic." *Id.* In particular, the "retrofitted courtrooms" would be equipped "with cameras at several critical angles to feature the Court, lectern, witness box, and exhibits." *Id.* (internal quotation marks omitted). And as the Protocol Ruling observed, "the case law [Smith and Alcorn] cite[d] only support[ed] the importance of jury observation by the trial judge, defendants, and defense counsel." *Id.* That is, the defendants had not presented any legal authority that supported their contention about the public always being able to view the jury. Finally, the court ruled that its implementation of the COVID-19 Protocol was "a reasonable alternative" to completely closing the trial courtroom. *Id.* at 10.

2.

a.

The trial of defendants Smith and Alcorn — after extensive pretrial proceedings — was scheduled for November 16, 2021.  As the government prepared for trial during the ongoing pandemic, however, it discovered that several victim witnesses would be unavailable to travel long distances to testify in Virginia, due to preexisting medical conditions, advanced ages, and high risks of serious health complications if they contracted COVID-19.  On October 26, 2021 — three weeks before the November trial date — the prosecutors filed a motion to take video depositions of several victim witnesses, pursuant to Rule 15 of the Federal Rules of Criminal Procedure, to preserve their testimony for trial.[5]  The government's Rule 15 motion was unopposed, but Smith filed a motion on October 27, 2021 to exclude the trial admission of the video depositions pursuant to the Confrontation Clause.

In particular, the evidence of three of Smith's victims — each of whom resided in or near Sacramento, California — is at issue here:

- Victim V.H., who was 73 years old and was the sole caretaker of her blind husband who was in the early stages of dementia.  V.H. was

---

[5] In pertinent part, Rule 15 of the Federal Rules of Criminal Procedure provides as follows:

A party may move that a prospective witness be deposed in order to preserve testimony for trial.  The court may grant the motion because of exceptional circumstances and in the interest of justice.

*See* Fed. R. Crim. P. 15(a)(1).

unable to travel or drive long distances due to her age and her husband's condition.

- Victim S.B., who was 81 years old, had medically retired from her job due to a mental breakdown caused by her extreme anxiety. She continued to suffer from crippling anxiety that rendered her unable to travel or drive long distances. S.B. also had limited mobility.

- Victim K.S., who was 64 years old, suffered from severe vertigo, which caused him to be unable to fly. He was the sole caretaker of his disabled wife.

Moreover, the three victim witnesses, due to their ages and health conditions, were each at an increased risk of serious health complications if infected with COVID-19. Compelling statements concerning the three victim witnesses were presented by the federal prosecutors to the trial court in a Declaration made by Inspector Jason W. Thomasson of the Postal Service. Thomasson corroborated each of the witnesses' individual situations with respect to, inter alia, their health problems and inability to travel to and testify in a Virginia trial.[6]

The district court granted the unopposed Rule 15 motion and authorized the prosecution to take the pretrial video depositions being sought, including those of V.H., S.B., and K.S. In so ruling, the court ordered that the government pay the costs incurred by the defendants and their counsel to attend the video depositions, in person or by

---

[6] Inspector Thomasson's Declarations relied, in part, on statements made by other federal officers. His sources included special agents of the Federal Bureau of Investigation ("FBI") and the Internal Revenue Service ("IRS"), in addition to an Assistant United States Attorney ("AUSA"). The AUSA had communicated with the three victim witnesses and ascertained that they were each unable to travel from California to Virginia and testify at trial.

videoconference.  On November 5, 2021, Smith's counsel and the prosecutors conducted the court-authorized depositions in the United States Attorney's Office in Sacramento. Defendant Smith, with his counsel, was present when the three victim witnesses testified, and the lawyers examined the witnesses and objected as they saw fit.  Two of the witnesses — V.H. and S.B. — were unable to drive themselves to the depositions, and law enforcement officers had to transport them.

b.

When the trial of defendants Smith and Alcorn was continued for three months — from November 2021 until early February 2022 — the prosecutors reconfirmed the continuing unavailability of the three victim witnesses who gave the video depositions.  On January 25, 2022 — approximately a week before the February trial date — the government filed a Supplemental Declaration made by Inspector Thomasson.  The Supplemental Declaration explained and confirmed that the bases for the three witnesses not being able to travel to and be present at the trial in Virginia were unchanged and continued to apply.

c.

On January 31, 2022, the district court filed a memorandum order addressing, inter alia, Smith's motion to exclude the video depositions under the Confrontation Clause.  *See United States v. Maerki*, No. 2:19-cr-00047 (E.D. Va. Jan. 31, 2022), ECF No. 371 (the "Evidence Ruling").  The court therein denied Smith's motion, concluding that the government had satisfied its burden and established the unavailability of the three deposed witnesses.  It also ruled that the prosecutors had made good faith efforts to obtain the trial presence of the three victim witnesses.

13

In making its Evidence Ruling, the district court explained that "the Government [had spelled] out in detail why the witnesses are unavailable and the good faith efforts they have made to procure their attendance at trial." *See* Evidence Ruling 8. The court emphasized that the ongoing pandemic presented

> heightened risks and substantial hardships for the deposed witnesses because they are all senior citizens who live in the Sacramento, California, area and therefore would need to take a minimum-seven-hour flight, including at least one layover, to travel to Virginia.

*Id.* The Evidence Ruling explained in further detail how the pandemic had compounded the personal circumstances of the three victim witnesses. And it specified their personal situations in the following detailed recitation:

- First, V.H. is 73 years old, the sole caretaker of her husband, S.H., who is legally blind and in the early stages of dementia. V.H. is also unable to drive long distances. For her deposition in Sacramento, law enforcement had to drive V.H. to and from the location and her husband accompanied her.

- Second, S.B. is 81 years old. Due to a mental breakdown, she medically retired from her job at a telephone company and continues to suffer from extreme, crippling anxiety. Her anxiety renders her unable to travel and she is also unable to drive long distances. For her deposition in Sacramento, law enforcement had to drive S.B. to and from the location. She also has limited mobility.

- Third, K.S. is 64 years old and suffers from extreme vertigo that prevents him from flying. His wife also recently suffered an accident in which she was severely injured, and he is the sole caretaker. There is no one else available to assist him.

- The Government informed all of the deposed witnesses that they were going to have to attend and testify at trial, but all of them informed the Government that they are unable to do so for the aforementioned reasons. Moreover, Postal Inspector Jason W. Thomasson personally met V.H., S.H., and S.B., and affirmed their unavailability based on his observations.

14

*Id.* at 7-8 (footnote and citations omitted). The Evidence Ruling thus concluded that the government had acted in good faith and sufficiently supported its position on the unavailability issue. As a result, the Evidence Ruling denied Smith's motion to exclude the video depositions.

C.

At the beginning of February 2022, the trial of defendants Smith and Alcorn commenced in Norfolk, and was conducted in accordance with the district court's COVID-19 Protocol. The prosecution presented extensive testimonial and documentary evidence, including 34 witnesses and more than 475 exhibits. And the prosecution's evidence detailed the fraud schemes that had been conceived and carried out by Smith, Alcorn, and their coconspirators — in which they primarily targeted elderly victims. More specifically, the evidence established that Smith was a financial investments salesman in California who had worked for Alcorn — who was primarily located in Arizona — and that Smith had sold millions of dollars' worth of fraudulent investments. More than 20 victims of the vast conspiracy testified at trial about the fraud schemes. Those witnesses included 12 victims to whom Smith had directly sold bogus investments.

The various victim witnesses each testified about being duped and defrauded by Smith. Several of them had learned of Smith through a Christian broadcast radio show that Smith had conducted about financial investments. His victims explained that Smith met with them to discuss their retirement situations and confirmed that they were all unsophisticated investors. In various discussions with Smith, he had vastly inflated his own experiences and successes, convincing the victim witnesses that he was trustworthy.

15

And despite Smith emphasizing his religious beliefs to several of his victims, Smith had lied to them in multiple ways.  Smith had falsely advised his victims that the DSPF and spectrum investments had successful track records, that they were safe investments, and that they carried low risks.  To several of the victims, Smith falsely asserted that he had personally invested in the marketed products.  And Smith had continued to sell those fraudulent investments to his victims, even after being warned that he was being investigated by government authorities and sued for misrepresentations.

Among Smith's victims were the three elderly deposed Californians identified as V.H., S.B., and K.S.  V.H. confirmed that she and her husband had trusted Smith with nearly $400,000 of retirement funds, including approximately $40,000 that was invested in DSPF.  Similarly, S.B. had given nearly all of her $100,000 pension fund to Smith for investments, and $25,000 of those funds went into the spectrum investments.  And K.S. had placed around $25,000 with Smith for spectrum investments.  None of those victims received any returns on their investments and, moreover, they lost a significant portion of their initial investments.

During the trial, defendant Smith again objected to the admission of the video depositions, asserting that, even though he and his counsel had been present and participated in the three depositions, their admission into evidence would contravene the Confrontation Clause.  More specifically, Smith asserted that the government had not sufficiently established that the three victim witnesses were unavailable for trial, arguing that the existence of the COVID-19 vaccine served to undermine their health concerns. Smith also maintained that the prosecution had failed to exercise good faith in its efforts to

secure the trial presence of the three victim witnesses.  In that regard, Smith argued that all three witnesses could travel cross-country by rail from California to Virginia and could be present in Norfolk after a 4-day train ride.  In the alternative, Smith asserted that the government could charter an airplane and fly the witnesses to Virginia, and thus minimize their health concerns.

In addition to the various fraud victims, other witnesses for the prosecution included representatives of state and federal regulatory agencies, who confirmed Smith and Alcorn's illegal sales of securities and the efforts of government regulators to stymie the fraudulent investments conspiracy.[7]  Several of Smith's and Alcorn's convicted coconspirators testified on behalf of the prosecution, and they explained their own "behind the scenes" fraudulent dealings with Smith and Alcorn, including the operations and sales approaches of the fraud schemes.  An expert financial analyst was called by the prosecution, and he traced the flow of fraudulently obtained money for the jury.  And an expert on the spectrum investment "market" — and the potentially spurious nature of spectrum investments — explained that complex subject for the jury.  For their part, Smith and Alcorn collectively called seven defense witnesses.  Neither Smith nor Alcorn testified.

### D.

The three-week trial concluded on February 23, 2022, with the jury rendering its verdict of guilty of all charges against both defendants.  The jury thus found Smith guilty

---

[7] The prosecution called supporting witnesses from various agencies, including California's Department of Insurance, the Financial Industry Regulatory Authority, the Securities Division of the Arizona Corporation Commission, and the FCC.

of the six offenses and Alcorn guilty of the 13 offenses lodged against them.  Smith was sentenced on August 24, 2022, and he received a prison term of 156 months, plus three years of supervised release.  Alcorn was sentenced on August 30, 2022, to 185 months in prison, plus three years of supervised release.

On appeal, Smith does not challenge his sentences in any respect.  Alcorn presents a single appellate challenge that concerns his term of supervised release and the conditions thereof.  We will therefore further discuss Alcorn's sentencing proceedings and his appellate contention with respect thereto.

After the jury convicted Alcorn of his 13 fraud-related offenses, the Probation Office prepared his presentence report (the "PSR") for the sentencing court.  The PSR confirmed that Alcorn was a leader and organizer of the mail and wire fraud conspiracies and that the amount of loss established for sentencing purposes was more than $20 million.  As pertinent here, the PSR identified multiple supervised-release conditions, under separate categories called "mandatory" conditions and "standard" conditions.  *See* J.A. 27882-84.  And the PSR recommended that the court impose 13 standard conditions of supervised release, incorrectly characterized in the PSR as "Standard Conditions of Supervision [which] have been adopted by this Court."  *Id.* at 27883.  Those standard conditions had not, however, "been adopted by this Court" through the entry of a standing order, by publication of a local rule, or otherwise.

During Alcorn's August 30, 2022 sentencing proceedings, the district court heard and considered the arguments of counsel, assessed the PSR, overruled various objections, and evaluated the 18 U.S.C. § 3553(a) sentencing factors.  Although the court did not

18

expressly adopt the PSR, the court explained that it had studied and relied on the PSR and
its recommendations in fashioning Alcorn's sentences.  After imposing the 185-month
prison term on Alcorn, the court also imposed his three-year term of supervised release.  In
the following brief statement, the court explained the standard conditions of supervised
release being imposed on Alcorn:

> You shall also comply with all standard conditions of supervised release that
> have been adopted by this Court — that is, this Court in the Eastern District
> of Virginia — and are incorporated into this judgment by reference.

*See* J.A. 27729.  The court thereby repeated the PSR's mischaracterization of the standard
conditions of supervised release as having "been adopted by this Court."

Alcorn did not object to any conditions of supervised release, nor did he indicate
any confusion concerning them.  At the conclusion of the sentencing proceedings, the
district court invited Alcorn to raise additional issues, and none were asserted.  The very
next day — August 31, 2022 — the court entered its written criminal judgment as to
Alcorn, which specifically identified the 13 standard conditions of supervised release
recommended in his PSR.[8]

Smith and Alcorn timely noted these consolidated appeals.  We possess jurisdiction
pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742.

---

[8] The 13 standard conditions, specified in the PSR and identified in Alcorn's
criminal judgment, established "the basic expectations for [Alcorn's] behavior while on
supervision."  *See* J.A. 27801.  Those conditions required Alcorn to, inter alia, notify his
assigned probation officer of relevant changes in his residence, contact with other felons,
or contact with law enforcement; remain in the federal judicial district at a residence
approved by his probation officer; seek or maintain full-time employment; and allow his
probation officer to conduct visits at his residence or elsewhere.

II.

As explained earlier, defendants Smith and Alcorn present a total of three contentions of error in these consolidated appeals — a single joint contention plus two individual contentions. First, Smith and Alcorn jointly maintain that the district court's implementation of the COVID-19 Protocol violated their rights under the Public Trial Clause. Second, Smith contends that the court erred in its Evidence Ruling by admitting the video depositions of three victim witnesses — V.H., S.B., and K.S. — in contravention of the Confrontation Clause. Finally, Alcorn asserts that the court erred in his sentencing by failing to impose in open court, during his sentencing proceedings, the 13 standard conditions recommended in the PSR and listed in the criminal judgment. We address and resolve each of those appellate contentions in turn.

A.

We first assess Smith and Alcorn's joint contention concerning the district court's implementation of the COVID-19 Protocol. That is, they argue that the court contravened the Public Trial Clause and denied their constitutional rights to a public trial. That joint contention, as an issue of law, will be assessed de novo. *See United States v. Barronette*, 46 F.4th 177, 191-92 (4th Cir. 2022).

1.

The Sixth Amendment provides that a criminal defendant has the right to a public trial. As the Supreme Court has explained, an "open trial . . . plays an important role in the administration of justice," and "[t]he value of openness lies in the fact that people not

actually attending trials can have confidence that standards of fairness are being observed." *Press-Enter. Co. v. Superior Court of Cal., Riverside Cnty.*, 464 U.S. 501, 508 (1984).  In contrast, "[p]roceedings held in secret . . . frustrate the broad public interest." *Id.* at 509. Although there is "a strong presumption in favor of openness, the right to an open trial is not absolute." *Bell v. Evatt*, 72 F.3d 421, 433 (4th Cir. 1995).  Indeed, it is settled that the presumption of openness "may give way in certain cases to other rights or interests." *Waller*, 467 U.S. at 45.  And trial judges possess sufficient discretion to "impose reasonable limitations on access" to a trial courtroom.  *Bell v. Jarvis*, 236 F.3d 149, 165 (4th Cir. 2000).

Several of our sister circuits have recognized that the implementation of various restrictions, fashioned to protect public health interests in trial court proceedings, can constitute a courtroom closure — either total or partial — under the Public Trial Clause. *See, e.g.*, *United States v. Veneno*, 94 F.4th 1196, 1204 n.1 (10th Cir. 2024); *United States v. Hunt*, 82 F.4th 129, 141 (2d Cir. 2023); *United States v. Ansari*, 48 F.4th 393, 403 (5th Cir. 2022).  In assessing whether a courtroom closure has been "total" or "partial," other courts of appeals have assessed, inter alia, whether members of the public were excluded from the courtroom and whether the public can learn of what transpired while the trial was closed, by way of transcripts, audio feeds, or video feeds.  *See, e.g.*, *United States v. Smith*, 426 F.3d 567, 571 (2d Cir. 2005).

In evaluating whether a total or partial courtroom closure was justified, a reviewing court should look to and apply the *Waller* test. Again, those factors are:

> [1] the party seeking to close the hearing must advance an overriding interest that is likely to be prejudiced, [2] the closure must be no broader than necessary to protect that interest, [3] the trial court must consider reasonable alternatives to closing the proceeding, and [4] it must make findings adequate to support the closure.

*Waller*, 467 U.S. at 48; *see also Barronette*, 46 F.4th at 193 (same). Under the first *Waller* factor, an "overriding interest" is required to justify a total courtroom closure. But if the closure is partial, "there must only be a 'substantial reason,' rather than an 'overriding interest' justifying the closure." *Smith*, 426 F.3d at 571 (collecting cases). Notably, several of our sister circuits have applied the less demanding "substantial reason" standard in assessing partial courtroom closures, because "a partial closure does not threaten as acutely the historical concerns sought to be addressed by the Sixth Amendment." *Jarvis*, 236 F.3d at 168 n.11 (collecting cases).

### 2.

Defendants Smith and Alcorn maintain that the trial court's implementation of the COVID-19 Protocol — which involved closing the trial courtroom to the public and streaming a video feed of the trial proceedings into the public viewing courtroom — contravened the Public Trial Clause.[9] As heretofore explained, the video feed to the public

---

[9] Smith and Alcorn do not take a position on whether the district court's procedure amounted to a total or partial closure of the courtroom. In their view, that determination is irrelevant because what occurred was sufficient to trigger the Public Trial Clause's safeguards and they allege the district court undertook inadequate safeguards under the last
(Continued)

viewing courtroom included views from multiple angles of the trial courtroom, so that interested observers in the public viewing courtroom could observe the lectern used by the lawyers, see the witnesses, look at the exhibits, and observe the presiding judge. Smith and Alcorn emphasize, however, the lack of any views of the jury in the video feed from the trial courtroom. In response, the government maintains that the trial court's implementation of the COVID-19 Protocol did not contravene the Public Trial Clause. The prosecution contends that Smith and Alcorn cannot show that the COVID-19 Protocol constituted even a partial courtroom closure, in the constitutional sense. And the government maintains that, if there was a partial closure of the trial courtroom, it was readily justified.

3.

a.

As an initial matter, we will evaluate whether implementation of the COVID-19 Protocol — which closed the trial courtroom to members of the public and streamed a live video feed from the trial courtroom into the public viewing courtroom, but omitted views of the jurors — constituted a partial closure under the Public Trial Clause. Smith and Alcorn make two contentions in support of their position that the public should be able to observe trial jurors in a criminal case. First, they argue that a public view of the jury will serve to protect a defendant from an unjust conviction, and help to ensure that the trial

---

three parts of the *Waller* test. In any event, it is obvious there was not a total closure of the courtroom and we need only address the partial-closure question.

participants fulfill their duties.  Otherwise put, Smith and Alcorn argue that the "Sixth Amendment public-trial right" was designed in part to keep a defendant's "triers keenly alive to a sense of their responsibility." *See United States v. Mallory*, 40 F.4th 166, 175 (4th Cir. 2022).

Second, Smith and Alcorn argue that the visibility of the jury to the public will serve to maintain the public's confidence in the judicial system.  The Ninth Circuit, they point out, recently vacated a conviction because the trial court had "fail[ed] to make the . . . jury subject to the public's eye," and prevented the public from seeing "the reactions of the jury to a witness's testimony" and other juror behavior. *See United States v. Allen*, 34 F.4th 789, 796 (9th Cir. 2022) (concluding that the trial court's failure to show *any* trial participants by way of a video feed "undermine[d] confidence in the proceedings" and violated the Public Trial Clause).

The lack of a view of the jury during Smith and Alcorn's trial is markedly distinct from a completely closed courtroom that might violate a defendant's right to a public trial. Although the jury in the trial courtroom could not be seen by those in the public viewing courtroom, interested observers were not prevented from seeing and hearing the trial proceedings.  Rather, the forum for public observation was merely shifted from the gallery of the trial courtroom to the public viewing courtroom.  And the district court's implementation of the COVID-19 Protocol provided a nearly complete public visual access to the trial of Smith and Alcorn.  The video feed of the trial proceedings was simultaneously streamed into the public viewing courtroom for members of the public.  And the video feed

included views of the lectern used by the lawyers, the witness box and thus the witnesses themselves, the various trial exhibits, and the presiding judge.

Smith and Alcorn's contention that it was unconstitutional for the jury not to be captured on the courtroom cameras, and thus not visible to members of the public in the public viewing courtroom, is a claim without merit. As the district court observed in the Protocol Ruling, Smith and Alcorn have failed to identify any authority for the proposition that such a specific angle of video feed is required for a trial proceeding to be deemed constitutional. And the court correctly emphasized that other courts have identified only "the importance of jury observation by the trial judge, defendants, and defense counsel." *See* Protocol Ruling 9.

We thus find ourselves in agreement with a district court in the District of Columbia, which — in a decision relied on by the trial court here — correctly recited that there is "no legal authority indicating that the Sixth Amendment requires every spectator to have a view of every angle of the Courtroom." *See United States v. Barrow*, No. 20-127, 2021 WL 3602859, at *11 (D.D.C. Aug. 13, 2021). And "[a]s a practical matter, a spectator viewing a trial from the courtroom gallery would not have a perfect sight line of each angle of the courtroom — let alone each individual juror." *Id.* In the context of these principles, and in the circumstances presented, we are satisfied that the lack of a view of the jury from the video feed of the trial courtroom can only be a partial courtroom closure at best.[10]

---

[10] Smith and Alcorn contend that the installation of an additional camera facing the jury or, in the alternative, a reconfiguration of the court's video system to provide for a (Continued)

b.

Assuming, without deciding, that the district court's implementation of the COVID-19 Protocol was a partial closure of the trial courtroom, we will evaluate whether that partial closure was justified. And we know that certain closures of courtrooms can be justified by the circumstances, "such as the defendant's right to a fair trial or the government's interest in inhibiting disclosure of sensitive information." *See Waller*, 467 U.S. at 45. Stemming the spread of COVID-19 and protecting public health are also "overriding interests" that could well support a total courtroom closure, as even Smith and Alcorn concede. *See* Br. of Appellant Smith 16-17 ("Nor do we dispute that under the first *Waller* prong, stemming the spread of COVID-19 and protecting public health are overriding interests that permitted the district court to require the public to view the trial from a separate room using a video feed." (citations and internal quotation marks omitted)).

After conceding *Waller*'s first prong, Smith and Alcorn plant their feet on its second requirement. Pursuant thereto, a partial courtroom closure "must be no broader than necessary" to protect the public health, and it must be justified by a "substantial reason." Smith and Alcorn thus contend that the trial court's implementation of the COVID-19

_____

view of the jury into the public viewing courtroom would have been sufficient to preserve their Sixth Amendment rights. But, as a practical matter, one additional jury-facing camera would not have allowed spectators in the public viewing courtroom to fully observe the jury. Under the COVID-19 Protocol, the jurors were socially distanced across "the majority, if not the entirety of the gallery" and thus, multiple cameras and equipment would have been necessary to capture a full view of the jury. *See* Protocol Ruling 7 n.4. We agree with the trial court that the defendants' demand — for a video feed featuring the jury that "would require a reconfiguration of the system that the Court [had] used successfully for months" — was "not required nor even preferred under the Sixth Amendment." *Id.* at 10.

Protocol by streaming a video that omitted views of the jury — who were dispersed in the trial courtroom's gallery — was "broader than necessary" to protect public health interests.

In support of their broader than necessary contention, Smith and Alcorn primarily rely on the Ninth Circuit's *Allen* decision. *See* 34 F.4th 789 (9th Cir. 2022). The *Allen* decision, however, is readily distinguishable and not our precedent. In *Allen*, the Ninth Circuit was faced with a complete courtroom closure during the COVID-19 pandemic, and the district-wide procedures that were applied excluded the public from the entire courthouse and provided public access to the court proceedings only by an audio feed. *Id.* at 797. Because the public was unable to observe any of the court proceedings, the Ninth Circuit was faced with a "total closure" of the trial courtroom, which was alleged to be overly broad. *Id.*

In evaluating whether the total courtroom closure in *Allen* was "broader than necessary," the court of appeals examined the COVID-19 protocols then being utilized by other federal courts. *See* 34 F.4th at 798-99. The *Allen* decision's comprehensive review "reveal[ed] that the district court's order to close [the entire courthouse] was 'truly exceptional.'" *Id.* at 798 (quoting *McCullen v. Coakley*, 573 U.S. 464, 490 (2014)). The Ninth Circuit therefore reversed the trial court in *Allen*, and emphasized that "some form of visual access" — through "a live video feed of the trial in a separate room of the courthouse, or by allowing a limited number of spectators to be present in the courtroom"

27

— was essential to protect "the core of the defendant's Sixth Amendment right . . . to have his trial open for public attendance and observation." *Id.* at 798.[11]

In this situation, as the Protocol Ruling emphasized, "[a]ll courthouse personnel [had] gone to extraordinary lengths to preserve a defendant's constitutional rights amidst a highly contagious, potentially lethal, and perpetually fluctuating pandemic." *See* Protocol Ruling 9. Given the extenuating circumstances of the COVID-19 pandemic, we are satisfied that if there was a partial closure here — no view of the jurors — it was not "broader than necessary" and it was supported by "substantial reason[s]."[12] Put succinctly, our de novo review of this issue confirms that the district court's implementation of the COVID-19 Protocol did not contravene the Public Trial Clause.

## B.

We turn next to defendant Smith's Confrontation Clause contention. Smith maintains therein that his rights under the Confrontation Clause were violated when the trial court admitted the video depositions, instead of requiring the three victim witnesses from California to appear and testify in Norfolk. Although we review de novo a

---

[11] In addressing the total courtroom closure in *Allen*, the Ninth Circuit emphasized the "importance of public observation of court proceedings" and agreed that "a transcript is not an adequate substitute for an open trial." *See* 34 F.4th at 796. And "[f]or the purposes of the [Public Trial Clause]," the court of appeals reasoned, "an audio stream is not substantially different than a public transcript." *Id.*

[12] In addition to satisfying the second *Waller* prong, the district court's application of the COVID-19 Protocol satisfied the third and fourth prongs. That is, the trial court considered reasonable alternatives to the partial courtroom closure, including its rejection of Smith and Alcorn's demand for a modified video feed. And the court made the requisite factual findings, including authorizing photographs of the interior of the trial courtroom.

constitutional challenge pursued under the Confrontation Clause, Smith's contention requires us to make certain "subsidiary assessments." *See United States v. Gutierrez de Lopez*, 761 F.3d 1123, 1143 (10th Cir. 2014) (reviewing de novo whether cross-examination restrictions contravened Confrontation Clause, but applying abuse of discretion standard of review to "subsidiary assessment" concerning threats to witness safety).

In our situation, we will evaluate for clear error the district court's factual findings that the prosecution made a good faith effort to secure the witnesses' presence at trial, but that the three victim witnesses were unavailable to testify. *See United States v. Gigante*, 166 F.3d 75, 79-80 (2d Cir. 1999) (reviewing for clear error factual findings made by trial court with respect to medical conditions that underpin unavailability ruling). And we will then assess for abuse of discretion the court's decision to admit the video depositions. *See United States v. McGowan*, 590 F.3d 446, 453 (7th Cir. 2009) (reviewing for abuse of discretion admission of deposition evidence due to witness unavailability); *see also United States v. Nicholson*, 676 F.3d 376, 383 (4th Cir. 2012) ("A district court abuses its discretion when it acts in an arbitrary manner, when it fails to consider judicially-recognized factors limiting its discretion, or when it relies on erroneous factual or legal premises."). Finally, we examine de novo Smith's contention that the Evidence Ruling violated the Confrontation Clause.

### 1.

Pursuant to the Confrontation Clause, a court will not admit into evidence "testimonial statements of a witness who did not appear at trial unless he was unavailable

to testify, and the defendant had had a prior opportunity for cross-examination." *United States v. Dargan*, 738 F.3d 643, 650 (4th Cir. 2013) (quoting *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004)). And a witness will not be "unavailable . . . unless the prosecutorial authorities have made a good faith effort to obtain his presence at trial." *Barber v. Page*, 390 U.S. 719, 724-25 (1968). A good faith effort, however, does not mean that the government must have exhausted every possible means of obtaining the witness's presence at trial. Rather, "[t]he lengths to which the prosecution must go to produce [the] witness . . . is a question of reasonableness" in the context of the particular case. *Ohio v. Roberts*, 448 U.S. 56, 74 (1980) (internal quotation marks omitted). And such an issue will generally be resolved through a highly fact-intensive inquiry. *See United States v. Tirado-Tirado*, 563 F.3d 117, 123 (5th Cir. 2009) ("[T]he inevitable question of precisely how much effort is required on the part of the government to reach the level of a 'good faith' and 'reasonable' effort eludes absolute resolution applicable to all cases." (internal quotation marks omitted)); *Christian v. Rhode*, 41 F.3d 461, 467 (9th Cir. 1994) ("While no court has articulated a standard for the diligence required of the prosecution in attempting to secure the defendant's presence at a deposition to be used at trial, it is clear that herculean efforts are not constitutionally required.").

Smith's unavailability contention requires an understanding of Rule 15 of the Federal Rules of Criminal Procedure and the Sixth Amendment's Confrontation Clause. To reiterate, the government requested that the district court approve the depositions of the three victim witnesses, pursuant to Rule 15. Rule 15(a)(1) provides that, in a criminal prosecution, "[a] party may move that a prospective witness be deposed in order to preserve

testimony for trial," and it authorizes the trial court to "grant the motion because of exceptional circumstances and in the interest of justice."  And Rule 15(c) requires that the accused receive notice, and that he be accorded his right to be present at the deposition.

As our colleagues on the Eleventh Circuit have explained, "the carefully-crafted provisions of Rule 15 . . . were designed to protect defendants' rights to [a] physical face-to-face confrontation."  *See United States v. Yates*, 438 F.3d 1307, 1315 (11th Cir. 2006).  And the Supreme Court has recognized that Rule 15 comports with the purposes of the Confrontation Clause.  *See Maryland v. Craig*, 497 U.S. 836, 845-46 (1990).  In that decision, the Court explained that the rights of an accused under the Confrontation Clause include not only a "Personal Examination," but also that the witness make "his statements under oath" and "submit to cross-examination."  *Id.* (citations and internal quotation marks omitted).  And the *Craig* decision emphasized that the Confrontation Clause "permits the jury that is to decide the defendant's fate to observe the demeanor of the witness."  *Id.* at 846 (internal quotation marks omitted).  Finally, the Court therein recognized that it had "never held . . . that the Confrontation Clause guarantees criminal defendants the *absolute* right to a face-to-face meeting with witnesses against them at trial."  *Id.* at 844.

## 2.

In his unavailability contention, defendant Smith maintains that the government failed to establish that the three victim witnesses were unavailable to testify at trial and, as a result, the video depositions were erroneously admitted.  He further argues that, contrary to the district court's explicit finding of unavailability, the prosecution failed to make a good faith effort to obtain the presence of the witnesses at trial.

Smith acknowledges that he was present with his lawyer at each of the three depositions, and that his counsel was accorded a full opportunity to cross-examine the three victim witnesses. But Smith nevertheless asserts that the prosecution failed to establish that the deposed witnesses were "unavailable." In support of this assertion, Smith makes two points: (1) that the government failed to make good faith efforts to obtain the trial presence of the three victim witnesses; and (2) that the district court's findings on the witnesses' medical conditions and caretaker obligations were clearly erroneous. Smith maintains that the government's justifications for the three victim witnesses not travelling from California to Virginia were inadequate. More specifically, Smith argues that the prosecutors relied only on generalized concerns about health issues during the pandemic, and that such reliance was insufficient to show that the three witnesses were unavailable.

Smith also argues that the prosecution's efforts were insufficient to satisfy its good faith obligations. He asserts that, "if there is a possibility, albeit remote, that affirmative measures might produce the declarant, the obligation of good faith *may* demand their effectuation." *See Roberts*, 448 U.S. at 74. He argues that the prosecutors could have subpoenaed the three elderly victim witnesses and transported them to Virginia from California by way of a chartered cross-country flight or a four-day train trip. As a result, he says that the trial court should have ruled that the prosecutors failed to make good faith efforts to produce the witnesses at trial.

The government responds that the trial court was correct in making its Evidence Ruling. Despite those efforts to secure the trial attendance of the three victim witnesses, they were "legally and factually unavailable." *See* Br. of Appellee 40. And the prosecution

32

emphasizes that the advanced ages of the witnesses, their various medical ailments, and their related difficulties of travelling cross-country rendered each of them unavailable.

### 3.

A showing of good faith requires that a "reasonable effort" be made to secure the witness's appearance. *See Roberts*, 448 U.S. at 74. According to the Supreme Court in *Roberts*, "[t]he law does not require the doing of a futile act" to secure the witness's trial appearance, much less proscribe some specific act. *Id.* Furthermore, a good faith showing does not require an effort to compel the witness's trial appearance through the subpoena process, nor does it require the government to take any other specific step to secure the witness's appearance. In any event, a multi-day cross-country train ride or a chartered flight were not, in these circumstances, reasonable alternatives for the three victim witnesses.

Indeed, the Evidence Ruling correctly concluded that the prosecutors engaged in good faith efforts to secure the three victim witnesses' trial presence, observing first that "[t]he Government informed all of the deposed witnesses that they were going to have to attend and testify at trial, but all of them informed the Government that they [were] unable to do so." *See* Evidence Ruling 8. And the court recognized that the three victim witnesses were of advanced ages, with various medical ailments and caretaker obligations. The court thus correctly found that "the ongoing COVID-19 pandemic present[ed] heightened risks and substantial hardships" that prevented them from travelling from California to Virginia for the trial. *Id.* at 7.

Postal Inspector Thomasson, based on his knowledge and investigation of the three victim witnesses' personal situations, confirmed in his Declarations the facts relied on in the Evidence Ruling. In addition to relating his personal observations about V.H. and S.B.'s circumstances, the Declaration explained that the prosecutors had reached out to the three witnesses in several instances to ascertain their ability or inability to travel to and testify in Virginia. The Declaration detailed how federal officials had contacted the witnesses by telephone — V.H. by an IRS special agent, S.B. by an FBI special agent, and K.S. by the same IRS special agent, and also by an AUSA — to assess their health and circumstances. Against the backdrop of the COVID-19 pandemic, and the ages and fragile health conditions of the witnesses, it was entirely reasonable for those efforts to be conducted by telephone.

Meanwhile, Smith presented no evidence on the unavailability issue, contesting only the sufficiency of the Declarations. Because the Declarations are uncontradicted, however, we are satisfied that the district court could not clearly err in concluding that the three victim witnesses suffered from medical conditions that precluded the witnesses from travelling long distances during the COVID-19 pandemic.

Finally, Smith also argues that the district court's finding of unavailability in the Evidence Ruling was clearly erroneous because it was based only on generalized concerns about the COVID-19 pandemic. But the Confrontation Clause is not blind to witness health and safety. Otherwise put, although "[t]he Confrontation Clause reflects a preference for face-to-face confrontation at trial," that preference "must occasionally give way to considerations of public policy and the necessities of the case." *See Craig*, 497 U.S. at

34

849.  In this situation, public health concerns and the personal safety of the three victim witnesses provided strong support for the Evidence Ruling.  As a result, the court's factual findings concerning the prosecution's good faith efforts and the victim witnesses' unavailability were not clearly erroneous.  Accordingly, the court did not abuse its discretion in making the Evidence Ruling.  And we are also satisfied — upon our ultimate de novo review — that Smith's Confrontation Clause claim must be rejected.

C.

1.

Finally, we address Alcorn's contention that the district court erred in his sentencing proceedings by failing to impose the "standard" discretionary conditions of supervised release in open court.  Section 3583 of Title 18 governs the imposition of conditions of supervised release.  Subsection (d) of § 3583 classifies supervised release conditions as either "mandatory" or "discretionary."  The mandatory conditions of supervised release must be imposed in every sentencing situation.  On the other hand, discretionary conditions of supervised release are subject, in part, to the sentencing court's discretion.  The Sentencing Guidelines also subdivide the discretionary conditions into "standard" conditions, which are recommended by the Guidelines for all impositions of supervised release, and "special" or "additional" conditions, which are appropriate only in specific situations.  *See* U.S.S.G. § 5D1.3(c)-(e); *see also United States v. Rogers*, 961 F.3d 291, 297 (4th Cir. 2020).

To properly impose a standard condition of supervised release that is discretionary, our precedent is that the "sentencing court must include that condition in its oral

pronouncement of [the] defendant's sentence in open court." *See United States v. Singletary*, 984 F.3d 341, 345 (4th Cir. 2021).[13]  Otherwise, it is possible for inconsistencies to arise between oral pronouncements of the court in the sentencing proceedings and the later-entered written criminal judgment.   And our Court has recognized such an inconsistency to be a *Rogers* error.  *See Rogers*, 961 F.3d at 300-01 (vacating sentence where written criminal judgment was inconsistent with defendant's oral sentence).

But we also recognize that a sentencing court is entitled to "satisfy its obligation to orally pronounce discretionary conditions through incorporation."  *See Rogers*, 961 F.3d at 299.  Such an "[e]xpress incorporation," as our *Rogers* decision explained,

> provides us, as a reviewing court, with the crucial objective indication that a district court has undertaken the necessary individualized assessment and made a considered determination, at the time of sentencing, that an identifiable set of discretionary conditions should be imposed on a defendant's supervised release.

*Id.* at 300.   A sentencing court is entitled to incorporate, during the oral sentencing proceedings, a written list of discretionary conditions of supervised release, such as the recommendations of conditions of release that have been spelled out in the defendant's PSR, or those established by a court-wide standing order.  *Id.* at 299.  In the *Rogers* case, the sentencing court advised the defendant that it was imposing "an additional term of supervision of 12 months."  *Id.* (internal quotation marks omitted).  But the court failed to

---

[13] The right of a defendant to be present at his sentencing proceedings derives from the Fifth Amendment's Due Process Clause. *See United States v. Gagnon*, 470 U.S. 522, 526 (1985); *see also Rogers*, 961 F.3d at 300 ("It is a critical part of the defendant's right to be present at sentencing." (internal quotation marks omitted)).

orally inform the defendant "that a *certain* set of [standard] conditions [would] be imposed on his supervised release." *Id.* (emphasis added). Because the *Rogers* court failed to incorporate any discretionary conditions of supervised release in open court during the sentencing proceedings, the "standard" conditions of supervised release thereafter listed — and first identified — in the written criminal judgment were erroneous and had to be vacated. *Id.* at 300-01.

2.

Before addressing the merits of Alcorn's sentencing claim, we must ascertain the appropriate standard of review. Although Alcorn did not present his *Rogers* claim to the sentencing court, he nevertheless argues that his contention is to be reviewed de novo. On the other hand, the government asserts that the de novo standard of review is not applicable, and that the *Rogers* error can only be assessed for plain error, in that Alcorn failed to raise a *Rogers*-related objection during his sentencing hearing. For support of its contention on the plain error standard, the government relies on *United States v. Elbaz*, where our panel applied plain error review in a similar situation. *See* 52 F.4th 593, 612 (4th Cir. 2022).

Put simply, we are satisfied that Alcorn is correct on the standard of review question, and that he is entitled to de novo review of his *Rogers* claim. Although a failure to object will generally trigger a plain error review, a *Rogers* claim has been recognized as different. That is, because the defendant being sentenced lacks any notice of the *Rogers* error until the court has entered its written criminal judgment, a de novo standard of review is applicable. Our decision in *United States v. Cisson* resolved that issue, and our good colleague Judge Motz explained the controlling principle:

37

> [W]hen a defendant fails to object in the district court, we ordinarily review for plain error. But *Rogers* claims are different by nature. A defendant who raises a *Rogers* claim argues that his written judgment is inconsistent with his oral sentence. A district court does not enter a defendant's written judgment until after it orally pronounces his sentence. So at the time of his sentencing hearing, a defendant would have *no way to know* that the court's oral pronouncement of his sentence might differ from the written judgment the court will later enter. As a result, we explained in *Rogers* that we review the consistency of the oral sentence and the written judgment de novo.

*See* 33 F.4th 185, 192 (4th Cir. 2022) (citations and internal quotation marks omitted). In *Cisson*, our Court also rejected the government's contention that the defendant's PSR — which recommended and listed the 13 standard discretionary conditions of supervised release — provided the defendant with sufficient notice to warrant his objection during the sentencing hearing. *Id.* at 193.

In this appeal, the government maintains that the *Cisson* ruling is not controlling, and it argues that the *Elbaz* decision controls and requires plain error review. In *Elbaz*, the defendant failed to object in open court at sentencing and our panel reviewed his *Rogers* claim for plain error. But *Elbaz* was not decided until November 2022, six months after our decision in *Cisson*.[14] And because those decisions conflict on the standard of review issue, the *Cisson* decision governs. *See McMellon v. United States*, 387 F.3d 329, 333 (4th Cir. 2004) (en banc) ("[W]e have made it clear that, as to conflicts between panel opinions,

---

[14] The *Cisson* case was decided on May 5, 2022, and the *Elbaz* case was not decided until November 3, 2022. Pursuant to *Cisson*, our Court has generally reviewed *Rogers* claims de novo. *See, e.g., United States v. Mathis*, 103 F.4th 193, 196 n.5 (4th Cir. 2024); *United States v. Lassiter*, 96 F.4th 629, 639 (4th Cir. 2022).

application of the basic rule that one panel cannot overrule another requires a panel to follow the earlier of the conflicting opinions.").[15]

Consistent with the foregoing, we are satisfied that *Cisson* — as the earlier panel decision on the standard of review issue — controls our analysis here. As a result, we are obliged to conduct a de novo review of the *Rogers* claim.

3.

Having identified the applicable standard of review, we turn to the merits of Alcorn's claim of a *Rogers* error. That is, we must decide whether the sentencing court properly incorporated by reference the "standard" discretionary conditions.

As heretofore explained, Alcorn's PSR recommended that the district court impose 13 standard conditions of supervised release, which the PSR characterized as "Standard Conditions of Supervision [which] have been adopted by this Court." *See* J.A. 27883. During the sentencing hearing, the court then stated to Alcorn:

> You shall also comply with all standard conditions of supervised release that have been adopted by this Court — that is, this Court in the Eastern District of Virginia — and are incorporated into this judgment by reference.

*Id.* at 27729. Significantly, however, the Eastern District of Virginia did not then have a standing order — or any order — adopting "standard conditions of supervised release."

---

[15] The government — realizing that *Cisson* predates *Elbaz* — has also argued in its response brief that *Elbaz* is nevertheless binding because it relied on our 2020 decision in *United States v. McMiller*, 954 F.3d 670 (4th Cir. 2020) (reviewing for plain error court's failure to explain special supervised release conditions imposed based on defendant's sex offender status). Although *McMiller* predates *Cisson*, however, it is distinguishable and thus not applicable, in that it did not involve a *Rogers* claim.

The government contends that the sentencing court implicitly adopted the 13 standard conditions of supervised release that were listed in Alcorn's PSR. For that proposition, the government relies on what it calls the "context" of the sentencing proceedings. Specifically, the government contends that the court referenced the PSR at various points during the sentencing proceedings, most notably when discussing a condition of supervised release that required drug testing. Furthermore, the government observes that the court adopted the PSR "for the purposes of establishing the advisory guidelines" in the unsigned sentencing minutes filed after the sentencing proceedings. *See* J.A. 22792. This "context," the government argues, means that the court properly incorporated the standard conditions of supervised release, and that Alcorn was given sufficient notice of those conditions.

As our Court recognized in *Rogers*, an adoption of proposed conditions of supervised release by a sentencing court — such as recommendations of such conditions set forth in the defendant's PSR — requires those conditions to be expressly incorporated. *See* 961 F.3d at 299. Here, although the sentencing court stated that it had "read," "considered," and "resolved all objections" to Alcorn's PSR, it did not *expressly adopt* the PSR before orally pronouncing Alcorn's sentence. *See, e.g.*, J.A. 27702-03 ("The Court has read . . . the Presentence Report, and the Court is prepared to go forward."); *id.* at 27730 ("The Court has considered . . . your lifestyle and financial needs as reflected in the Presentence Report . . . ."); *id.* at 27711 ("Mr. Alcorn, the Court has resolved all objections that you have to this Presentence Report.").

40

Moreover, our Court in *Cisson* rejected the proposition that a probation officer's foreshadowing of a defendant's sentence can relieve the sentencing court of its obligation to pronounce in open court all discretionary terms of supervised release. *See* 33 F.4th at 193 ("Unless and until a district court adopts a presentence report's recommendations, those recommendations remain just that: nonbinding *recommendations*."). Because the sentencing court failed to expressly adopt the PSR's recommended conditions of supervised release in open court, the government's effort to rely on the list of conditions in the PSR is misplaced.

The prosecutors also have a fallback position, relying on a separate aspect of *Cisson*. In *Cisson*, our panel rejected a claim that the sentencing court had "failed to adequately announce [the defendant's] discretionary conditions," but recognized that the court had "stat[ed] that it would impose the 'standard' conditions of supervised release." *See* 33 F.4th at 194. And *Cisson* recognized that the "District of South Carolina has no standing order listing its own 'standard' conditions that differs from the Guidelines list of standard conditions found at U.S.S.G. § 5D1.3(c)." *Id.* Thus, "there [was] no other set of 'standard' conditions to which the court could have been referring other than the Guidelines 'standard' conditions." *Id.* The government argues that the lack of a standing order in the Eastern District of Virginia when Alcorn was sentenced is similar to the South Carolina situation that was faced in *Cisson*. And it suggests that the sentencing court — in ordering Alcorn to "comply with all standard conditions of supervised release that have been adopted by this Court" — was, in making that statement, actually referring to the standard conditions

41

of supervised release listed in the Sentencing Guidelines, which track the standard conditions recommended and spelled out in Alcorn's PSR.

The facts of *Cisson*, however, are materially distinguishable. In *Cisson*, the sentencing court stated only that it would impose the "mandatory and standard conditions" of supervised release. *See* 33 F.4th at 194. At Alcorn's sentencing, on the other hand, the court imposed the "standard conditions of supervised release *that have been adopted by this court — that is, this Court in the Eastern District of Virginia*." *See* J.A. 27729 (emphasis added). The specific reference by the judge to the standard conditions adopted by "this Court in the Eastern District of Virginia" fatally undermines the government's final contention, that Alcorn's sentencing court was somehow referring to a list of standard conditions contained in the Sentencing Guidelines.

We are thus constrained to agree with Alcorn. As in the *Rogers* sentencing dispute, "the problem . . . is not with the concept of pronouncement by incorporation." *See* 961 F.3d at 299. The problem is that the district court did not expressly incorporate the standard conditions of supervised release by expressly adopting the PSR or otherwise. *Id.* at 300. Moreover, the court referred only to a standing order in the Eastern District of Virginia that did not exist. Having carefully considered Alcorn's sentencing contention de novo, we are constrained to agree that a *Rogers* error was committed. We thus vacate Alcorn's sentences and remand for plenary resentencing. *See United States v. Lassiter*, 96 F.4th 692, 640 (4th Cir. 2024) ("Our precedents are clear: When a *Rogers* error occurs, we must vacate the

entire sentence and remand for full resentencing."); *see also Singletary*, 984 F.3d at 346 n.4.[16]


### III.

Pursuant to the foregoing, we affirm Smith's various convictions and sentences, and we also affirm each of Alcorn's convictions. On the other hand, we vacate Alcorn's sentences and remand for appropriate resentencing proceedings.

Appeal No. 22-4508 — *AFFIRMED*

Appeal No. 22-4521 — *AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED*

---

[16] In defense of the sentencing court, it is unfortunate that the PSR contained a misstatement about the standard conditions that "have been adopted by this Court," which appears to have led the court to use that erroneous terminology. *See* J.A. 27883. In addition, when the court asked the lawyers near the end of the sentencing proceedings if there were other matters that should be covered, both lawyers — as well as the probation officer — indicated that there was nothing further. *Id.* at 27733.

AGEE, Circuit Judge, concurring in part and concurring in the judgment:

I concur in the majority's opinion insofar as it affirms Smith and Alcorn's convictions (and Smith's sentence), joining fully Judge King's opinion with respect to II.A and II.B, and I concur in the judgment vacating Alcorn's sentence and remanding for resentencing because that is required under the binding precedent of this Court. I write separately, however, to again point out the mess that has resulted from the Court's decisions in *United States v. Rogers*, 961 F.3d 291 (4th Cir. 2020), and *United States v. Singletary*, 984 F.3d 341 (4th Cir. 2021).

Judge King ably explains the district court's error. During a district court's pronouncement of special conditions of supervised release, it can cross-reference specific conditions set out elsewhere without reciting their terms in full. But any such cross-reference must be clear and ultimately consistent with the written judgment. Here, during sentencing, the district court echoed an error in the PSR by purporting to cross-reference special conditions of supervised release listed in a "standing order" within the district. No such standing order existed at the time of sentencing. The written judgment lists special conditions of supervised release set out in Alcorn's PSR, but those conditions were never specifically adopted by the district court (nor did the court expressly adopt the PSR itself). As a result, the supervised release portion of Alcorn's sentence utilizes an ineffective cross-reference and contains an ultimately inconsistent oral pronouncement and written judgment. Under *Rogers* and *Singletary*, Alcorn is thus entitled to plenary resentencing.

I fully recognize that I am bound by *stare decisis*. As Judge Quattlebaum and I have previously opined, however, plenary resentencing in these circumstances is not required

by Supreme Court case law. Our precedent to the contrary was a byproduct of inconsistent reasoning in our own case law, rendering it—unsurprisingly—a lonely outlier within the circuit courts of appeals. *See United States v. Kemp*, 88 F.4th 539, 547–53 (4th Cir. 2023) (Quattlebaum, J., concurring); *United States v. Lassiter*, 96 F.4th 629, 640–42 (4th Cir. 2024) (Agee, J., concurring in part and concurring in the judgment).

We should correct course soon, both for the development of the law within our own circuit and to avoid drifting further astray from the approach taken in all other courts of appeals. *See Kemp*, 88 F.4th at 551 (Quattlebaum, J., concurring) (describing why requiring plenary resentencing is "an outlier among other circuits"). Since a panel cannot implement such course correction, however, we remain bound in this case to vacate the sentence and remand for a full resentencing. Therefore, I concur in the judgment as to Alcorn's resentencing. But hopefully this Court sitting en banc or the Supreme Court will intervene sooner rather than later to set the law aright.

TOBY HEYTENS, Circuit Judge, dissenting:

I would vacate both defendants' convictions and remand for a new trial. "The constitutional preference and presumption . . . is that trials be held in courtrooms where the public can be present both to observe the trial and ensure participants in the trial—witnesses, jurors, the judge—know they are being observed." *State v. Bell*, 993 N.W.2d 418, 423 (Minn. 2023). This rule rests in part on the belief "that judges, lawyers, witnesses, *and jurors* will perform their respective functions more responsibly in open court" because "the presence of interested spectators may keep [a defendant's] triers keenly alive to a sense of their responsibility and to the importance of their functions." *Waller v. Georgia*, 467 U.S. 39, 46 & n.4 (1984) (quotation marks removed) (emphasis added); accord *United States v. Allen*, 34 F.4th 789, 796 (9th Cir. 2022) (stressing the value of permitting spectators to see "the reactions of the jury to a witness's testimony").

The COVID-19 pandemic created myriad challenges for the criminal justice system, and the district court and its staff went "to extraordinary lengths to preserve a defendant's constitutional rights amidst a highly contagious, potentially lethal, and perpetually fluctuating pandemic." JA 508. But faced with an unopposed request to ensure spectators could see the jury, it was not enough to cite efforts already made, note that changes "would require a reconfiguration of the [existing] system," or observe (correctly) that there is no constitutional requirement that "every spectator [must] have a view of every angle of the Courtroom." JA 508–09 (quotation marks removed). Instead, I would hold the district court needed to "make express, specific findings" about whether there were "reasonable alternatives" that would have given spectators at least some view of the jury, and, if not,

why the existing limits on public access were "no broader than necessary." *Bell*, 993 N.W.2d at 426–27 (citing *Waller*, 467 U.S. at 48); see, *e.g.*, *United States v. Veneno*, 107 F.4th 1103, 1121 (10th Cir. 2024) (Rossman, J., concurring in part and dissenting in part) (noting that one district court was able to add a "visual component" to a previously audio-only stream over a day's lunch break). Because no such findings were made here, I would vacate both defendants' convictions and remand for a new trial.

*    *    *

I would also vacate Smith's conviction for another reason. The Sixth Amendment gives criminal defendants "the right . . . to be confronted with the witnesses against" them. U.S. Const. amend. VI. That provision generally permits introduction of out-of-court "testimonial statements" by a person who does not appear at trial *only* if the person is "unavailable to testify" and the defendant "had a prior opportunity for cross-examination." *Crawford v. Washington*, 541 U.S. 36, 53–54 (2004). The government never denies that a pretrial deposition under Federal Rule of Criminal Procedure 15 is a testimonial statement, and Smith admits he "was able to cross-examine the relevant witnesses at their depositions," Smith Br. 24. This case thus comes down to whether the district court erred in concluding the witnesses were "unavailable" in a constitutional sense, and, if so, whether any such error was harmless.

Many "unavailability" situations are straightforward. Take dead people. Or those in an irreversible coma. Or those who have lost the ability to communicate because of a mental condition. Everyone agrees such people are unavailable for Confrontation Clause purposes. A witness is also "unavailable" in a constitutional sense if they cannot be located,

47

see, *e.g.*, *Ohio v. Roberts*, 448 U.S. 56, 75–77 (1980), or where a witness declines to appear voluntarily and the court lacks the power to compel their attendance, see, *e.g.*, *Mancusi v. Stubbs*, 408 U.S. 204, 211–12 (1972) (witness had moved outside the United States).

This case presents no such circumstances. When Smith's trial happened, the witnesses whose pretrial depositions were admitted against him were living, conscious, and competent to offer in-court testimony. The government knew where the witnesses were, and it concedes they were within the court's subpoena power. See Fed. R. Crim. P. 17(e)(1) (authorizing nationwide service of subpoenas in federal criminal cases).

To be sure, the Supreme Court has described the ultimate question for "Sixth Amendment unavailability" as whether "the prosecutorial authorities have made a *good-faith effort* to obtain" a witness's "presence at trial." *Roberts*, 448 U.S. at 74. But "the prosecution bears the burden of establishing this predicate," *id.* at 75, and all the government offered here was a declaration from a postal inspector stating the witnesses said they were unable to attend and providing the inspector's observations about the witnesses' health problems. The government has been unable to cite any case where a witness within the trial court's subpoena power was declared constitutionally "unavailable" despite the government never even serving a subpoena.[1] I would not make this one the first. Cf. *Barber v. Page*, 390 U.S. 719, 720, 724 (1968) (holding that state prosecutors failed to show a witness was unavailable when he was being held in a federal prison outside the

---

[1] Although the postal inspector's declaration says the witnesses were told "the government was serving [them] with a subpoena," JA 423, the government does not challenge Smith's assertion that no subpoenas were ever served.

state at the time of trial and the prosecutors "made no efforts to avail themselves" of legal options for securing his attendance).

At oral argument, the government predicted all three witnesses would have ignored subpoenas and insisted no court would have issued a material witness warrant requiring them to fly across the country amid COVID-19-related lockdowns. Maybe so. But it seems clear there is at least "a *possibility*"—however "remote"—that a person who has expressed an unwillingness or inability to travel to attend a trial may change their tune when presented with a legal document ordering them to appear. *Roberts*, 448 U.S. at 74 (emphasis added). Nothing more is required for Smith to prevail.

The government's real argument, it seems to me, is that these witnesses had *excellent reasons* for not traveling across the country and it would have been inappropriate—even irresponsible—for the government to have further prodded them to do so. Fair enough. But the government cites no authority suggesting the strength of a witness's justifications for not testifying at trial has any bearing on whether the witness is "unavailable" in a constitutional sense. Such a principle would also risk eroding criminal defendants' confrontation rights whenever a witness's reasons for not appearing are valid and sympathetic.

The facts here provide an apt illustration. Of the three absent witnesses, all were elderly, two had non-COVID-19 medical conditions that counseled against travel, and two were sole caretakers for family members. They thus would have had strong reasons for not wanting to appear even absent the pandemic. But many people are of "advanced age and poor health" or have substantial family support obligations, and permitting trial courts to

declare all such witnesses unavailable and thus permitted to testify via pretrial deposition would "violate[ ] both the literal language and the purpose of the Confrontation Clause." *Stone v. Sowders*, 997 F.2d 209, 210, 213 (6th Cir. 1993). Here, as in other contexts, the government must weigh the burdens on potential witnesses against the need for their testimony, and the government—not criminal defendants—must bear the consequences when it elects not to force the issue. In short, I think the constitutional unavailability inquiry turns *solely* on the nature and reasonableness of the government's "effort[s]" to secure the witness's "presence at trial," *Roberts*, 448 U.S. at 74 (quotation marks and emphasis removed), and that the district court made a legal error in concluding otherwise.[2]

Finally, I cannot say the Confrontation Clause violations here were harmless beyond a reasonable doubt. See *Chapman v. California*, 386 U.S. 18, 24 (1967). The government has been unable to identify a single case finding it harmless to admit the entire testimony of a witness who accused the defendant of committing a crime—much less a case where

---

[2] Although the Supreme Court has approved a procedure permitting a witness to testify outside the defendant's presence in at least one instance, the government does not defend the district court's ruling on that ground. In *Maryland v. Craig*, 497 U.S. 836 (1990), the Supreme Court rejected a Sixth Amendment challenge to a carefully limited procedure that, "when invoked, prevent[ed] a child witness from seeing the defendant as he or she testifie[d] against the defendant at trial." *Id.* at 851. This case does not involve child witnesses, and *Craig* did not sanction taking a pretrial deposition and then playing it during trial. See *id.* (noting that the relevant procedure permitted "the judge, jury, and defendant . . . to view (albeit by video monitor) the demeanor (and body) of the witness as he or she testifies" and specifically declining to hold that the testimony was even "given out of court"). And far from asking us to extend *Craig*'s holding to cover this situation, the government did not mention *Craig* in its briefs or at oral argument, choosing to go all in on defending the district court's unavailability ruling. Cf. *United States v. Buster*, 26 F.4th 627, 634–35 (4th Cir. 2022) (declining to consider arguments for admissibility the government had not made).

the same violation happened three times during one trial. And this case seems a poor candidate to break that streak, given that the government repeatedly referenced all three absent witnesses by name during both its initial closing argument and its rebuttal and implored the jury to "[r]emember" things it had learned from "the depositions you saw." JA 3248–49; see JA 3281–84, 3355. I thus would vacate Smith's convictions based on the Confrontation Clause as well.